## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ALFONSO GONZALEZ,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:11-CV-137** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **HOSTETLER TRUCKING, INC.,** | : | |
| | : | **Magistrate Judge Abel** |
| **Defendant.** | : | |
| | : | |

## OPINION & ORDER

This matter is before the Court on the Defendant Hostetler Trucking, Inc.'s (the "Company" or "Defendant") Motion for Summary Judgment against Plaintiff Alfonso Gonzalez ("Gonzalez"), pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 26.) For the foregoing reasons, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

### A. Factual Background

Defendant Hostetler Trucking is a trucking and farming business, owned by Nelson Hostetler. Nelson's wife, Fern Hostetler, is president of the Company. Defendant also employs Jeff Hostetler and Kyle Hostetler, Fern and Nelson's sons. Fern and Nelson spend the winter months, from approximately December 1 to April 1, in Florida, and Jeff Hostetler acts as the on-site supervisor of operations during their absence. (*F. Hostetler Aff.*, Doc. 27-6, ¶ 8; *N. Hostetler Aff.*, Doc. 27-5 at 17.)

Gonzalez, a Hispanic-American of Mexican descent, was employed by Hostetler from on or about September 9, 2009 until April 5, 2010. (*See F. Hostetler Aff.*, Doc. 27-6, ¶ 2.) Although

Gonzalez did not have a specific job title, *see id*. at ¶6, he assisted the shop mechanic who worked on the Company's trucks.  (*N. Hostetler Dep*., Doc. 27-5 at 14.) At the time of Gonzelez's hiring, Christopher Mayhorn was, in Gonzalez's words, Hostetler Trucking's "head mechanic."  (*K. Hostetler Dep*., Doc. 27-13 at 14.) Gonzalez testified that Mayhorn "got [Gonzalez] the job," and Nelson hired Gonzalez after only a brief exchange, based on Mayhorn's recommendation. (*Gonzalez Dep*. 27-1 at 41.) Gonzalez further testified that Mayhorn directed his activities and trained him to do mechanical repairs on semi-trucks, including changing tires, brakes, lights, oil, filters and working on transmissions and alternators. (*Gonzalez Dep*. 27-1 at 42-43.) Sometime after Gonzalez was hired, Mayhorn left his position and was replaced with John Mercer ("Mercer"), who purportedly performed the same duties with respect to Gonzalez. (*Gonzalez Dep*., Doc. 27-1 at 55-56.)[1]

Gonzalez also asserts that he was supervised by Nelson, Jeff and Kyle Hostetler, and that he received directives from one or more of these individuals daily.  (*Id*. at 46-47; *F. Hostetler Aff*., Doc. 27-6, ¶¶ 7, 9.) Defendant also employed Christopher Hanscel ("Hanscel"), a supervisor who worked primarily on the farming side of the Company's operations.  (*Id*. at 56-57; *F. Hostetler Aff*., Doc. 27-6, ¶¶ 3-4.)  Although Defendant asserts that Gonzalez had limited contact with Hanscel given their respective positions, (*see F. Hostetler Aff*., Doc. 27-6, ¶¶ 3-4), Gonzalez testified at his deposition that he would see Hanscel when Hanscel came to the mechanic's area to pick up tools, or when Hanscel was driving equipment on company property.  (*Gonzalez Dep*., Doc. 27-1 at 56-57.)

Gonzalez testified that, on a daily basis, Mercer and Kyle Hostetler called him names including "spic," "spic bitch," "wetback nigger," and "wetback." (*Id*. at 64, 68, 72-73, 77-80.)

---

[1] Hostetler asserts that Nelson Hostetler was actually Gonzalez's supervisor, but concedes that Gonzalez worked with Mercer during his employment.  (*F. Hostetler Aff*., Doc. 27-6, ¶¶ 7, 9.)

Among other incidences, Gonzalez testified that Kyle called him a "wetback" 5-6 times per day, (*id*. at 72), and called him a "spic" about 15 times during the course of Gonzalez's employment, and a "spic bitch" once.  (*Id.* at 69.) Gonzalez testified that he asked Kyle and Mercer to stop referring to him in that manner "numerous times," (*id*. at 72), and recalls specifically telling Kyle not to call him a "spic bitch."  (*Id*. at 69-70.)  Gonzalez further testified that he asked Mercer to stop by pointing to his nametag and saying, "This is my name right here," and that Mercer would respond by saying, "[Your] name is wetback nigger."  (*Id*. at 79.)  Gonzalez also testified at his deposition that this name-calling was done in the presence of other co-workers and supervisors, including Jeff Hostetler. (*Id*. at 70-71, 73, 75, 78-79.)

Gonzalez also testified that, on approximately March 25, 2010, he had a conversation with Nelson Hostetler, during which Nelson Hostetler notified him that Hanscel did not like "wetbacks" and "niggers." (*Gonzalez Dep*., Doc. 27-1 at 65-67, 106.) Defendant maintains that it is extremely unlikely that any conversation between Gonzalez and Nelson Hostetler took place, as Nelson lives in Florida from December 1 thru April 1. Hanscel denies ever making such a comment to Nelson Hostetler.  (*Hanscel Dep*., Doc 27-15 at 7-8 and 13.) Gonzalez does not assert that Hanscel never made such a comment directly to him, and testified at his deposition that the two rarely, if ever, spoke during the course of Gonzalez's employment.  (*Gonzalez Dep*., Doc. 27-1 at 65-66.)

The last day Gonzalez worked at Hostetler was March 30, 2010. (*See* F. *Hostetler Aff.*, Doc. 27-6, ¶ 2.) Gonzalez called in sick via text message on March 31, 2010, April 1, 2010 and April 2, 2010.  (*Id.*; *Text Msg. Correspondence*, Doc. 27-18.) On April 5, 2010, Gonzalez sent Nelson Hostetler a text message notifying him that Gonzalez was quitting and would not be returning to work. The text message stated: "Hey this is Papas [Gonzalez]. I won't be coming

back because I do not feel safe working around someone you said don't like Mexicans and niggers." (*Gonzalez Dep.*, Doc. 27-1 at 104; *Text Msg. Correspondence*, Doc. 27-18.)

Gonzalez testified he met with an attorney about the alleged discrimination prior to quitting his position with the Company. (*Gonzalez Dep.*, Doc. 27-1 at 81.) The attorney sent Defendant a letter dated April 5, 2010 outlining the alleged discrimination and making a monetary demand.  Gonzalez testified that he did not return to work because he "really felt like it would be harmful for [him] to still work there" once the Company received the letter, and he "felt fear for his life."  (*Id.*)

Defendant denies Gonzalez's allegations of harassment and a hostile work environment. In particular, Defendant counters that the Company has a robust anti-harassment policy, and offers affidavits and deposition testimony from various employees (and members of the Hostetler family), averring that they never witnessed any harassment.  (*See, e.g. F. Hostetler Aff*, Doc. 27-6, ¶¶ 12-16.) Although Kyle admits that he called Gonzalez a "wetback" occasionally, he insists that he did so in a joking manner.  Moreover, although Kyle admitted in his deposition that these terms were somewhat degrading, he asserted that he did not believe they were offensive to Gonzalez because Gonzalez referred to himself as a "wetback" and a "spic," and never requested that Kyle stop calling him those names.  (*K. Hostetler Dep.*, Doc. 27-13 at 21, 24, 26, 31.) Gonzalez denies calling himself these names. (*Gonzalez Dep.*, Doc. 27-1 at 110.) Defendant also argues that Gonzalez admitted in his deposition that he never felt threatened by any of the name calling because he could handle himself and simply ignored what they were saying. (*Id.* at 81.)

Defendant also highlights that Gonzalez admitted in his deposition that he did not report the incidents to either Nelson or Fern Hostetler, (*Gonzalez Dep.*, Doc. 27-1 at 70-74,)  despite the fact that Gonzalez stated in an affidavit accompanying a subsequent Ohio Civil Rights

Commission complaint that he reported these incidents to management.  (*See OCRC Aff.*, Doc. 27-9.)   Defendant further seeks to undermine Gonzalez's credibility by pointing out inconsistencies between Gonzalez's deposition testimony and his interrogatory answers, with respect to the specific names Gonzalez alleges he was called, and the alleged frequency of those epitaphs. (*See Def.'s Mem. in Support*, Doc. 27 at 2 n.2, 6 n.6, 7 n.8.)

### B. Procedural History

Plaintiff filed this action against Defendant on February 11, 2011, alleging: (1) racial harassment, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e), et seq. ("Title VII"); (2) national origin harassment, in violation of Title VII; (3) retaliation in violation of Title VII; (4) common law negligent retention; and (5) common law negligent supervision. (Doc. 1.) On September 1, 2011, Gonzalez amended his complaint to include claims for: (6) national origin harassment pursuant to the Ohio Civil Rights Act, O.R.C. § 4112.99 and Ohio common law; and (7) retaliation pursuant to the Ohio Civil Rights Act. (Doc. 10.) Defendant denies any illegal conduct.

On April 19, 2012, Defendant moved to dismiss the suit for failure to prosecute.  (Doc. 20.) This Court denied Defendant's motion in an Order dated October 29, 2012. (Doc. 25.)

On October 31, 2012, Defendant moved for summary judgment on all claims.  (Doc. 26.) Plaintiff opposes Defendant's motion only with respect to the federal and state law harassment claims, and the common law negligent retention and supervision claims. (Doc. 30 at 3 n.2.) Defendant's Motion has been fully briefed, and the Court heard Oral Argument from counsel. These matters are therefore ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed.  R. Civ.  P.  56(c).  A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)).

A movant for summary judgment meets its initial burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Dixon v. Anderson*, 928 F.2d 212, 216 n. 5 (6th Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)). At that point, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Id*. (quoting Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is not, however, the role of the trial court to "resolve factual disputes by weighing conflicting evidence because it is the jury's role to assess the probative value of the evidence." *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 230 (6th Cir. 1990) (citing *Stone v. William Beaumont Hosp.*, 782 F.2d 609, 615 n. 5 (6th Cir. 1986); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980)). All evidence and reasonable inferences must be viewed in the light most favorable to the party opposing the motion. *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. LAW AND ANALYSIS

Plaintiff does not oppose Defendant's Motion with respect to Gonzalez's federal and state law retaliation claims (Counts 3 and 7 of the Amended Complaint), or Gonzalez's common law national origin harassment claim (contained in Count 6 of the Amended Complaint).  (*Pl.'s Mem.*

*Contra*, Doc. 30, 3 n.2.) Summary Judgment is therefore **GRANTED** as to these claims. The Court considers Defendant's Motion with respect to the remaining claims below.

### A. *Hostile Work Environment Claims*

Gonzalez's harassment claims under Title VII and the Ohio Civil Rights Act (Counts 1, 2, and 6 of the Amended Complaint) are analyzed under the same framework, and are properly viewed as hostile work environment claims.  Title VII prohibits discrimination by an employer on the basis of a person's race, color, religion, sex or national origin.  42 U.S.C. § 2000(e), *et seq*. Such "illegal discrimination may be found when a plaintiff establishes that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Russell v. University of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

As the Sixth Circuit has confirmed, "[t]he *McDonnell Douglas* burden-shifting approach also applies to hostile-work-environment claims." *Clay v. UPS,* 501 F.3d 695, 706 (6th Cir. 2007). To establish a prima facie case of a hostile work environment based on racial harassment, Gonzalez must show:

> (1) [ ]he is a member of a protected class; (2)[ ]he was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with [his] work performance by creating an environment that was intimidating, hostile, or offensive; and (5) employer liability.

*Id.* (citing *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999)).

Here, there is no question that Gonzalez was a member of a protected class, or that the conduct alleged – if it took place – would constitute harassment on the basis of race and/or national origin.  Rather, Defendant takes issue with the fourth prima facie element, and argues that the conduct alleged "was not sufficiently severe or pervasive to constitute actionable

harassment." (*Def.'s Mem. in Support*, Doc. 27, 10.) Defendant also argues that Gonzalez cannot satisfy the fifth prima facie element – employer liability – because the Company took reasonable steps under the circumstances to prevent harassment by its personnel. (*Id*. at 14.)

### 1. Creation of a Hostile Work Environment

As the Sixth Circuit has explained, "[w]hether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is 'quintessentially a question of fact.'" *Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Jordan v. City of Cleveland,* 464 F.3d 584, 597 (6th Cir.2006) (internal quotation marks omitted)). In order "[t]o determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances." *Id*. (quoting *Harris,* 510 U.S. at 23). Thus, 'the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together—the reported incidents make out such a case." *Jackson v. Quanex Corp*., 191 F.3d 647, 659 (6th Cir. 1999) (quoting *Williams v. General Motors Corp.,* 187 F.3d 553 (6th Cir. 1999)).

In determining whether a hostile work environment exists, a fact-finder evaluates the conduct at issue by both an objective and subjective standard. *Hawkins*, 517 F.3d at 333 (citing *Harris,* 510 U.S. at 21-22). Thus, a plaintiff must establish "both that the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive." *Id*. (citing *Harris,* 510 U.S. at 21-22). When considering whether a plaintiff has met these standards, "[s]ummary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment." *Id*. (citing *Abeita v. Transam. Mailings, Inc.,* 159 F.3d 246, 250 (6th Cir. 1998)).

**a. Objective Standard: Severe or Pervasive**

To be actionable, it is not enough that the conduct at issue is merely offensive, *id.* (citing *Harris,* 510 U.S. at 21); "[i]nstead, the workplace must be permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment." *Id.* (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65-67 (1986). As the Sixth Circuit has explained, "[t]he determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a 'mathematically precise test.'" *Hawkins*, 517 F.3d at 333 (quoting *Abeita,* 159 F.3d at 251) (alteration original). A nonexhaustive list of factors for courts to consider includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006).

Plaintiff argues that egregious invectives like "spic," "wetback," and "wetback nigger" are so severe that even a single usage would be sufficient to create a hostile work environment. Defendant counters that, in the Sixth Circuit, as a matter of law, "isolated incidents" of racial remarks "will not amount to discriminatory changes in the terms and conditions of employment." *Long v. Ford Motor Co*., 193 Fed.Appx. 497, 502 (6th Cir. 2006) (holding that episodes of harassment through racial remarks involving only two individuals on two discrete instances were not pervasive enough to constitute a hostile or abusive working environment).

Certainly, a reasonable jury could find invectives like "spic," "wetback," and "wetback nigger," to be objectively offensive and abusive. *See Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1149 (9th Cir. 1997) ("Calling someone a "dumb Mexican" is an egregious and

bigoted insult, one that constitutes strong evidence of discriminatory animus on the basis of national origin."); *Torres v. Pisano,* 116 F.3d 625, 632-33 (2d Cir. 1997) ("[A] reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a 'dumb spic' and told her that she should stay home, go on welfare, and collect food stamps like the rest of the 'spics' to be hostile."); *E.E.O.C. v. Ceisel Masonry, Inc., 594 F.Supp.2d 1018, 1023* (N.D. Ill. 2009) ("Unambiguously racial epithets such as ["weback" and "fucking Mexican"] fall on the more severe end of the spectrum … indeed, it is difficult to imagine epithets more offensive to someone of Hispanic descent.") (quoting *Cerros v. Steel Technologies, Inc.,* 398 F.3d 944, 950-51 (7th Cir. 2005)). *See also Payton v. Receivables Outsourcing, Inc*., 840 N.E.2d 236, 241 (Ohio. App. 2005) (in evaluating a claim under the Ohio Civil Rights Act, noting that "[a] single act of sexual harassment may be sufficient to create a hostile work environment if it is of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work").

This Court need not decide, however, whether a single use of the epithets above would be sufficient to create a hostile work environment, because Plaintiff offers evidence that they were used by his co-workers and/or supervisors multiple times a day, on an ongoing basis. The Sixth Circuit has repeatedly "acknowledged that [offensive] comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive." *Hawkins*, 517 F.3d at 333. *See, e.g., Abierta*, 159 F.3d at 252 (in the context of a hostile work environment claim involving allegations of sex-based discriminating, holding that "[a] victim's assertion that the harasser's sexual comments were 'ongoing,' 'commonplace,' and 'continuing' was sufficient to survive summary judgment on the severe or pervasive test); *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) ("While the Court has noted that 'simple teasing,' offhand comments, and

isolated incidents' ordinarily do not amount to discrimination under Title VII, an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhand or isolated. Rather, such continuous conduct may constitute severe and pervasive harassment.") (internal citations omitted) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998)); *Torres v. County of Oakland,* 758 F.2d 147, 151 (6th Cir. 1985) (noting that "continuing use of racial or ethnic slurs would violate Title VII"); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981) ("Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII.").

Here, Gonzalez has presented evidence that he was referred in terms like "spic," "wetback," and "wetback nigger" almost daily –  sometimes multiple times per day – by multiple individuals, in the presence of other co-workers and managers. Thus, viewing this evidence in the light most favorable to the non-moving party, a reasonable jury could find that the alleged discriminatory conduct was indeed pervasive, and that Gonzalez's working conditions were discriminatorily altered as a result. Defendant's attacks on Gonzalez's credibility in this regard are inapposite:  at the summary judgment stage, it is not the role of the trial court to "resolve factual disputes by weighing conflicting evidence." *Kraus*, 915 F.2d at 230. The Court therefore finds disputed questions of material fact as to whether the conditions of Plaintiff's employment were objectively hostile and abusive.

### b. Subjective Regard

Plaintiff has also offered evidence of that he subjectively regarded the environment as abusive.  Gonzalez testified at his deposition that he repeatedly asked Mercer and Kyle Hostetler to stop using those racial invectives, and found them offensive and hurtful. (*Gonzalez Dep*., Doc. 27-1 at 89-90, 111.)  Moreover, his text message to Nelson Hostetler on April 5, 2010 indicated

that he feared for his safety. (*Id.* at 81.) Defendant makes much of the fact that Gonzalez never reported the alleged harassment to Nelson or Fern Hostetler, and argues that if Gonzalez actually felt abused, threatened and/or offended, he would have reported it. While a reasonable jury could draw this inference, it could as easily conclude that Gonzalez had good reason not to report these incidents: one of the primary perpetrators of the alleged harassment was Fern and Nelson's son, Kyle. *See Jackson*, 191 F.3d at 659, 663 (employer has affirmative defense to Title VII liability only if the plaintiff's failure to take advantage of corrective opportunities was "unreasonable") (Title VII standards for employer liability "nowhere … specify that the plaintiff, or any other individual, must 'report' the offensive conduct … to the employer."). In any case, at the summary judgment stage, it is not for this Court to weigh the evidence and make credibility determinations. Based on the above evidence, the Court finds a dispute of material fact as to Gonzalez's subjective regard for his work environment that must be resolved by a jury. *Hawkins*, 517 F.3d at 333 ("Summary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment.").

## 2. Employer Liability

If a plaintiff can show that a hostile work environment existed, he or she must then establish fifth prima facie element: employer liability. To satisfy this element, a plaintiff must prove that his employer "'tolerated or condoned the situation' or 'that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action.'" *Jackson*., 191 F.3d at 659 (quoting *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir. 1988)).

As this Court has stated previously, "[t]he standards for employer liability differ if the alleged harasser is a co-worker or a supervisor." *Stayner v. Ohio Dep't of Rehabilitation*, 2011 WL 3900617, *7 (S.D. Ohio Sept. 6, 2011). When a co-worker is the source of the harassment,

an employer is liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Hawkins*, 517 F.3d at 338 (citing *Blankenship v. Parke Care Ctrs.,* 123 F.3d 868, 873 (6th Cir. 1997)) (explaining that, after the Supreme Court's decisions in *Ellerth* and *Faragher*, "an employer may be held liable when its remedial response is merely negligent, however well-intentioned," but applying *Blankenship* to define negligence as an employer response that "manifests indifference or unreasonableness in light of the facts"). In contrast, when the hostile work environment is "created by a supervisor with immediate (or successively higher) authority over the employee," the employer is vicariously liable. *Jackson*, 191 F.3d at 659 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). This strict liability is subject to an affirmative defense where the allegedly discriminatory conduct at issue does not include an adverse employment action, such as discharge, demotion, or undesirable reassignment. *Stayner*, 2011 WL 3900617 at *7 (citing *Collette v. Stein–Mart, Inc.,* 126 Fed. Appx. 678, 682 (6th Cir. 2005)); *Jackson*, 191 F.3d at 659 (citing *Ellerth,* 524 U.S. at 765).

### a. Vicarious Liability For Supervisor Harassment

#### i. Whether Mercer and Kyle Hostetler Were Supervisors

To determine whether the supervisory standard applies, we first consider whether Mercer and Kyle Hostetler are properly considered "supervisors."[2] The Supreme Court's recent decision in *Vance v. Ball State University*, 133 S.Ct. 2434 (2013), narrowed the definition of "supervisor" for the purposes of vicarious liability under Title VII. Specifically, *Vance* held that "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim,

---

[2] Because Gonzalez does not allege that Hanscel was among those who harassed him – indeed, Gonzalez testified at his deposition that he had barely any interaction with Hanscel over the course of his employment, Gonzalez Dep., Doc. 27-1 at 51, 56 – we do not consider whether Hanscel was a supervisor for the purposes of vicarious liability.

*i.e.,* to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id*. at 2443 (quoting *Ellerth,* 524 U.S. at 761). *Vance* considered hostile work environment claims brought by a catering assistant, Vance, who alleged that she was repeatedly racially harassed by Davis, a specialist in the catering division. Although the parties "vigorously dispute[d] the nature and scope of Davis' duties," they agreed that Davis "did not have the power to hire, fire, demote, promote, transfer, or discipline Vance." *Id*. Thus, despite "Davis' job description, which gave her leadership responsibilities, and [] evidence that Davis at times led or direct Vance or other employees in the kitchen," *id*. at 2449, the Supreme Court held that Davis was not a supervisor for the purposes of Title VII as a matter of law, "[b]ecause there [wa]s no evidence that [the employer] empowered Davis to take any tangible employment actions against Vance." *Id*. at 2454.

Because *Vance* was decided after the matter *sub judice* was fully briefed, the parties did not address the legal standard for "supervisor" articulated in that case. In particular, Plaintiff's evidence that Mercer and Kyle Hostetler directed Gonzalez's daily activities is now inapposite – under *Vance*, the relevant question is whether Kyle Hostetler or Mercer were empowered to take tangible employment actions against Gonzalez. The record is unclear as to precisely which individuals at Hostetler Trucking were empowered to hire, fire, promote or reassign Gonzalez. Under *Vance*, however, "tangible employment actions" also include any action that "effects a significant change in employment status." Thus, if an individual is empowered by an employer to make reports, recommendations, or evaluations of an employee that lead directly to a significant change in that employee's employment status, that individual would be a "supervisor"

for the purposes of vicarious liability under Title VII.   The record contains evidence that Mercer was so empowered.

In particular, Gonzalez testified at his deposition that – though Gonzalez started his employment only after filing an application and talking briefly to Nelson Hostetler – Mercer's predecessor, Mayhorn, recommended Gonzalez and "got [Gonzalez] the job."  (*Gonzalez Dep*., Doc. 27-1 at 41.)  Moreover, the record contains evidence that it was Mayhorn, and later Mercer, who trained Gonzalez, oversaw and reviewed Gonzalez's work performance, and assigned Gonzalez concrete individual tasks associated with the larger repair and maintenance projects identified by Nelson at the Company's morning meetings. Construing this evidence in Gonzalez's favor, a reasonable jury could find that the application and brief exchange associated with Gonzalez's hiring were merely pro forma – particularly given that Nelson was not himself a mechanic, and thus had limited ability to evaluate Gonzalez's qualifications for the position. As such, even if hiring, firing, promotion and transfer decisions for Gonzalez's position ultimately rested with Nelson Hostetler, a reasonable jury could conclude that Mayhorn's judgment was dispositive in the decision to hire Gonzalez. Further, in light of the evidence that Mercer replaced Mayhorn and held the same position and influence within the Company, a reasonable jury could likewise conclude that Mercer's report, recommendation, or evaluation with respect to Gonzalez could similarly effect a significant change in Gonzalez's employment status.  If a jury finds that a negative report or recommendation from Mercer had the power to effect a significant change in Gonzalez's employment status (e.g., termination, discharge, demotion or transfer), then Mercer would be a "supervisor" for the purposes of vicarious liability. Thus, there remains a question of material fact as to whether Mercer was Gonzalez's "supervisor" for the purposes of Title VII.

ii. Affirmative Defense

When allegations of harassment involve a supervisor, the Supreme Court distinguishes between supervisor harassment that includes an adverse employment action and supervisor harassment that does not. *Stayner*, 2011 WL 3900617 at *7. If the conduct includes an adverse employment action, such as discharge, demotion, or undesirable reassignment, then the employer is strictly liable. *Id.* (citing *Collette,* 126 Fed. Appx. at 682 (6th Cir. 2005)). In contrast, where, as here, there is no tangible employment action,[3] "an employer may raise an affirmative defense to liability by proving, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of corrective opportunities provided by the employer." *Jackson*, 191 F.3d at 659 (citing *Ellerth,* 524 U.S. at 765).

If Mercer was a "supervisor" for the purposes of Title VII, Defendant bears the burden of proving its affirmative defense. Defendant argues that it satisfied the first prong of the affirmative defense because it had an anti-harassment policy in place and Fern and Nelson Hostetler were not aware of Mercer's alleged supervisory harassment. Defendant also argues that the second prong is satisfied by Gonzalez's admission that he never reported the harassment to Fern and Nelson Hostetler, and Fern and Nelson's respective confirmations that no such reports were filed.

Gonzalez, however, has presented evidence that: (1) Nelson Hostetler was in the office on a daily basis for the majority of the year; (2) harassment was continuous and ongoing; and (3)

---

[3] Plaintiff argues that there has been an adverse employment action here, in the form of a constructive discharge. The Supreme Court's decision in *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), however, forecloses that argument in this case. The *Suder* Court held that, although "a constructive discharge is functionally the same as an actual termination in damages-enhancing respects … when an official act does not underlie the constructive discharge, the *Ellerth* and *Faragher* analysis … calls for the extension of the affirmative defense to the employer." *Id.* at 148. Because Plaintiff's constructive discharge arguments are not predicated on any official action by the Company, Defendant is entitled to avail itself of the *Ellerth/Faragher* affirmative defense.

16

the harassing conduct took place in the presence of multiple employees, including Jeff Hostetler, who was undisputedly in charge of on-site operations when his parents were in Florida for the winter. A reasonable jury who credits this evidence could conclude that Nelson and Fern Hostetler knew or should have known about Mercer's conduct, did nothing, and declined to enforce the Company's anti-harassment policy. Moreover, should a jury credit Gonzalez's evidence about the hostility of the workplace, the fact that a primary perpetrator of the alleged harassment was the owner's son, and Gonzalez's fears for his safety following the mailing of the April 5, 2010 attorney letter, it could also conclude Plaintiff's failure to report the discrimination earlier was not unreasonable. Notably, "nowhere do the above delineated standards [for employer liability] specify that the plaintiff, or any other individual, must 'report' the offensive conduct … to the employer." *Jackson*, 191 F.3d at 663. Rather, as the Sixth Circuit has made clear, the standard is whether the employer "'knew or should have known' of the offenses." *Id*. The Court therefore finds that there is a dispute of material fact as to whether Defendant has met its burden to prove the affirmative defense to vicarious liability for supervisory harassment, if indeed Mercer was a "supervisor" for the purposes of Title VII.

### b. Liability for Co-Worker Harassment

Even if Mercer is not a supervisor, there remains a dispute of material fact as to whether employer liability exists with respect to the alleged conduct of Mercer and Kyle Hostetler. As discussed above, "employer liability in cases of coworker harassment is not derivative, but instead depends on the employer's 'own acts or omissions.'" *Hawkins*, 517 F.3d at 340 (citing *Blankenship v. Parke Care Ctrs.,* 123 F.3d 868, 873 (6th Cir. 1997)). Thus, when a co-worker is the source of the harassment, an employer is liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Id.* at 338

(citing *Blankenship v. Parke Care Ctrs.,* 123 F.3d 868, 873 (6th Cir. 1997)).  In contrast, an employer's response "is generally adequate … if it is "reasonably calculated to end the harassment." *Id.* at 340 (citing *Jackson,* 191 F.3d at 663-64) (holding that the employer failed to prove that its actions were "a reasonable attempt to prevent and correct the problem of racially harassing behavior").

As described above, Gonzalez has presented evidence that Mercer and Kyle Hostetler's harassment took place on a daily basis, in the presence of multiple employees including Jeff Hostetler, and that Nelson Hostetler was in the office daily for the majority of the year.[4] Viewing the facts in the light most favorable to Gonzalez as the non-moving party, a reasonable jury could conclude that Nelson Hostetler knew or should have known of the harassment. *Id.* (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 587).  Moreover, it is undisputed that Defendant did not intervene or otherwise take any action to end Mercer and Kyle Hostetler's alleged behavior toward Gonzalez.  Thus, if a fact-finder determines that Defendant knew or should have known of such conduct, it could likewise find that Defendant's response was indifferent and unreasonable.  Accordingly, there exist genuine issues of material fact precluding the grant of summary judgment.

Based on the above, Defendant's Motion for Summary Judgment is **DENIED** with respect to Gonzalez's federal and state law hostile work environment claims, as stated in Counts 1, 2 and 6 of the Amended Complaint.

### B. Negligent Retention and Supervision

Gonzalez also asserts claims under Ohio common law for negligent retention and supervision. Under Ohio Common law, the elements of negligent supervision and retention are:

---

[4] Gonzalez's evidence that Nelson was aware that Hancsel harbored racial animus toward "Mexicans" and "niggers" is inapposite, as Hanscel is not among the alleged perpetrators of the ongoing harassment on which Gonzalez's claims are based.

> 1) an employment relationship; 2) incompetence of the employee; 3) actual or constructive knowledge of the incompetence by the employer; 4) an act or omission by the employee which caused the plaintiff's injuries; and 5) negligent retention of the employee by the employer, which action is the proximate cause of the plaintiff's injuries.

*Payton v. Receivables Outsourcing, Inc*., 840 N.E.2d 236, 247 (Ohio App. 2005) (citing *Mills v. Deehr,* Cuyahoga App. No. 82799, 2004-Ohio-2338, 2004 WL 1047720, at ¶ 13 (Ohio App. 2004); *Steppe v. Kmart*, 737 N.E.2d 58 (Ohio App. 1999)).

As a threshold matter, Defendant argues that Plaintiff's negligent supervision and retention claim nevertheless fails because Gonzalez has not alleged and cannot prove that any of Hostetler Trucking's employees are individually liable to him at tort.  Plaintiff contends that Ohio law imposes no such requirement.

In *Strock v. Pressnell*, 527 N.E.2d 1235, (Ohio 1988), the Ohio Supreme Court considered whether a church could be held liable for negligent supervision or training of a minister who allegedly engaged in an affair with woman while providing marriage counseling to the woman and her then-husband. After concluding that the minister had committed no actionable wrong against the former husband, the *Strock* Court explained:

> It is axiomatic that for the doctrine of *respondeat superior* to apply, an employee must be liable for a tort committed in the scope of his employment. Likewise, an underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person, who then seeks recovery against the employer. Because no action can be maintained against [the minister] in the instant case, it is obvious that any imputed actions against the church are also untenable.

*Id*. at 1244.  In cases where the alleged underlying conduct at issue is a common law tort, subsequent Ohio Court of Appeals decisions, as well as the Sixth Circuit, have interpreted *Strock* to require that a plaintiff allege and prove that the employee who perpetrates that conduct is individually liable to the plaintiff for that tort.  *See Greenberg*

19

*v. Life Insurance Co. of Virginia,* 177 F.3d 507, 517-18 (6th Cir. 1999) (plaintiffs could

not assert negligent training and supervision where they could not prove any set of facts

that would support their claims of fraud and negligent misrepresention); *Myers v.*

*Goodwill Indus. of Akron, Inc.*, 721 N.E.2d 130, 134 (Ohio Ct. App. 1998) (negligent

retention claim against employer failed where plaintiff could not show that employee's

conduct rose to the level of intentional infliction of emotional distress); *Campbell v.*

*Colley,* 680 N.E.2d 201, 206 (Ohio Ct. App. 1996) (because dispatcher could not be

liable for negligence due to statutory immunity, employer also could not be held liable)).

        In *Minnich v. Cooper Farms, Inc*., 39 Fed. Appx. 289 (6th Cir. 2002)

(unpublished), the Sixth Circuit considered an Ohio negligent retention and supervision

claim that rested on alleged sexual harassment by an employee. In light of *Strock* and its

progeny, *Minnich* surmised that, under Ohio law, a plaintiff subject to wrongful

discriminatory conduct would also have to demonstrate a viable claim against an

employee to sustain a negligent retention claim against an employer. Because there was

no avenue by which the plaintiff could hold her co-worker personally liable for the

wrongs done – the statute of limitations for assault and battery had lapsed, the employee

could not be held individually liable for sexual harassment under Title VII (which

provides only for employer liability), *see Wathen v. Gen. Elec. Co.,* 115 F.3d 400, 405

(6th Cir. 1997), and the employee was not a supervisor or manager who could be liable

for harassment under O.R.C. § 4112.01(A), *see Genaro v. Cent. Transport, Inc*., 703

N.E.2d 782, 785 (Ohio 1999) – *Minnich* concluded that the district court had not erred in

granting summary judgment to the Defendant on that claim. *Minnich,* 39 F.3d at 296.

Subsequently, however, an Ohio Court of Appeals for the first time considered the viability of negligent retention and supervision claims premised on discriminatory employee harassment. Specifically, *Payton v. Receivables Outsourcing, Inc*., 840 N.E.2d 236, 247 (Ohio Ct. App. 2005), considered whether a plaintiff subject to sexual harassment by a co-worker could sustain state law claims against her former employer for: 1) hostile work environment; 2) retaliation; and 3) negligent supervision and retention.  *Id.* On the facts of the case, the plaintiff could not have held her co-worker individually liable for discrimination under O.R.C. § 4112, *see Genaro*, 703 N.E.2d at 785, nor for the common law tort of sexual harassment, which requires proof of the same elements necessary to establish a statutory claim for hostile work environment sexual harassment under O.R.C. § 4112.02(A). *See Bell v. Cuyahoga Cmty. Coll.,* 717 N.E.2d 1189, 1193 (Ohio Ct. App. 1998) (citing *Kerans v. Porter Paint Co.,* 575 N.E.2d 428 (Ohio 1991)).  Nevertheless, *Payton* held that the plaintiff had established genuine issue of material fact as to all elements of the negligent retention and supervision claim, and, therefore, reversed the trial court's grant of summary judgment for the defendant. *Payton*, 840 N.E.2d at 247.

That a different rule would apply to negligent retention and supervision cases based on discriminatory harassment and hostile work environment claims makes sense.  Where the underlying employee conduct at issue is a common law tort, a plaintiff's inability to establish a viable tort claim means that the plaintiff cannot establish that the employee committed wrongful acts that caused the plaintiff injury.  As such, by definition, the plaintiff cannot satisfy all prima facie elements of a negligent supervision and retention claim. In contrast, the absence of individual employee liability under Title VII or O.R.C. § 4112 does not necessarily preclude a finding that the employee's conduct was wrongful and caused the plaintiff injury.  Thus, as

*Payton* demonstrates, under Ohio law, a plaintiff's inability to state a claim against an employee for wrongful discriminatory conduct does not bar employer liability claim unless the barrier to personal liability also negates an element of the negligent retention and supervision claim. *See Strock*, 527 N.E.2d at 1244 ("[A]n underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort *or guilty of a claimed wrong against a third person*.") (emphasis added).  As such, this Court defers to the Ohio state courts' interpretation of its own laws and here applies the approach employed in *Payton*.[5]

Ultimately, however, Gonzalez's negligent retention and supervision claim would survive summary judgment even if Ohio law did require that Gonzalez be able to state a viable claim against the harassing employee.  As discussed above, O.R.C. § 4112, imposes individual liability on managers and supervisors for discriminatory conduct found to be in violation of O.R.C. § 4112. *See Genaro*, 703 N.E.2d at 785.  An individual is a "manager" or a "supervisor" for the purposes of O.R.C. § 4112, when he or she meets the Title VII standard for "supervisor" articulated in *Vance*. *Braun v. Ultimate Jetcharters, Inc*., No. 5:12-cv-01635, 2013 WL 2873238, *9 (N.D. Ohio July 25, 2013) (citing *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Comm'n,* N.E.2d 128, 132 (Ohio 1981) ("[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964, [42 U.S.C. § ] 2000(e) *et seq.,* ... is

---

[5] Defendant also cites *Dortch v. Fowler*, 588 F.3d 396 (6th Cir. 2009), for the proposition Gonzalez cannot sustain a negligent retention and supervision claim unless he alleges and proves that Mercer and/or Kyle Hostetler are individually liable to him in tort. *Dortch* considered whether a plaintiff injured in a traffic accident with a tractor-trailer could sustain a Kentucky negligent retention claim against the employer of the tractor-trailer driver. *Dortch*, 588 F.3d at 405. The plaintiff, Dortch, also asserted a separate negligence claim against the tractor-trailer driver, Fowler. *Id*. As the Sixth Circuit explained, Fowler's employer "could be liable to Dortch for negligently supervising and retaining Fowler only if Fowler caused the traffic accident in question." *Id*. Thus, because the jury returned a verdict in favor of the Fowler on the underlying negligence claim, the Sixth Circuit held that Dortch could not sustain a negligent retention claim against Fowler's employer.  *Id.* at 405-406.  Thus, again, the absence of a viable underlying negligence claim negated one of the prima facie elements of negligent supervision and retention – something that does not necessarily occur in the absence of an individual claim against an employee who perpetuates a hostile work environment.  In any case, even if *Dortch* were construed to preclude employer liability under Kentucky law in all cases where the employee cannot be held individually liable (including hostile work environment cases), as discussed above, Ohio common law imposes no such limitation – as evidenced by the Ohio Court of Appeals' decision in *Payton*.

generally applicable to cases involving alleged violations of [Ohio Revised Code] Chapter 4112."); *Vance*, 133 S.Ct. at 2443).  As described above at length, there exists a genuine question of material fact as to whether Mercer is a "supervisor" under the meaning of *Vance*. Accordingly, there also exists a question of material fact as to whether Mercer could be held individually liable for discriminatory conduct under O.R.C § 4112.

This Court therefore now turns to the question of whether, construing the evidence in the light most favorable to the non-moving party, Gonzalez is able to state a prima facie case of negligent supervision and retention under Ohio law.  The first prong of the test for negligent retention requires that "an employment relationship exists between the employer and the alleged harasser." *Payton*, 840 N.E.2d at 247 (Ohio App. 2005). Here, it is undisputed that Mercer and Kyle Hostetler were employed by the company.  The first prima facie element is, therefore, satisfied.

The second prong of the negligent retention and supervision test "requires incompetence on the part of the offending employee."  *Id. Payton* held that, for the purposes of this prong, "sexually harassing behavior is per se incompetent behavior." *Id.* ("In this context, incompetence relates not only or exclusively to an employee's lack of ability to perform the tasks that his or her job involves. It also relates to behavior while on the job inapposite to the tasks that a job involves and which materially inhibits other employees from performing their assigned job tasks. Sexually harassing behavior is within that definition.") (quoting *Harmon v. GZK, Inc.*, Montgomery App. No. 18672, 2002 WL 191598, at *46 (Ohio App. Feb. 8, 2002)). Here, as described above, there is a genuine dispute of material fact about whether Gonzalez encountered harassment so severe and pervasive that it would materially affect the conditions of his employment. Under Ohio law, such harassment would be per se incompetent. *Payton*, 840

N.E.2d at 247. Thus, there is likewise a question of material fact as to whether Gonzalez has satisfied the second prong of the negligent retention and supervision test.

The third prong "is actual or constructive knowledge of the abuse on the part of the employer." *Id*. Defendant argues that Gonzalez has not satisfied this prong, because the Company had no prior knowledge of the alleged conduct. Moreover, Defendant seeks to distinguish *Payton* because the *Payton* plaintiff had complained to the employer of the harasser's conduct on two separate occasions prior to the harassment then at issue in that case. Nevertheless, the legal standard for articulated in *Payton* is one of "actual *or constructive* knowledge." *Id*. (emphasis added). Here, Gonzalez has alleged that the harassment allegedly perpetrated by Mercer and Kyle Hostetler was continuous and ongoing over the course of months, in the presence of other employees. If a jury credits that testimony, it could conclude that the Company had actual or constructive knowledge of Mercer's and/or Kyle Hostetler's conduct well-before Gonzalez left his position. Accordingly, there is a genuine issue of material fact with respect to the third prong which is properly resolved by a jury.

The fourth prong requires "an act or omission by the employee which caused the plaintiff's injuries." *Id*. As such, the *Payton* Court found the fourth prong's "requir[ment that] an act by the alleged harasser … caused the plaintiff's injuries" to be satisfied for the purposes of summary judgment where the plaintiff testified that she had experienced "nightmares, loss of appetite, a sudden inability to relate to men, and daily crying jags to support her allegation of injury." *Payton*, 840 N.E.2d at 247. In this case, Gonzalez has testified that he found Mercer and Kyle Hostetler's alleged continuous harassment hurtful, offensive and abusive, and it caused him distress. Although Defendant argues that Gonzalez experienced no such mental injury,

especially in light of Gonzalez's testimony that he had no real fear until his attorney mailed the April 5, 2010 letter, this is a matter of credibility to be weighed by the jury.

Finally, the fifth prong "requires negligent retention of the alleged harasser "by the employer, which action is the proximate cause of the plaintiff's injuries." *Id*.  This prong is satisfied "[i]f the employer had prior knowledge of the alleged harasser's incompetence, that is, his subjecting fellow employees to [] harassment, and despite this knowledge failed to intervene to prevent a recurrence of the behavior in the workplace." *Id*. at 248. Likewise, here, if a jury credits Gonzalez's evidence that the Company knew of the harassment and failed to intervene to prevent its continuation, it could find the fifth prong satisfied.

In light of the above, the Court finds that there are genuine issues of material fact as to Gonzalez's common law negligent retention and supervision claims that preclude the grant of summary judgment.  Defendant's Motion is therefore **DENIED** with respect to Counts 4 and 5 of the Amended Complaint.

## IV. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.  Defendant's Motion is **GRANTED** with respect to Gonzalez's federal and state law retaliation claims (Counts 3 and 7 of the Amended Complaint), and common law national origin harassment claim (contained in Count 6 of the Amended Complaint).   Defendant's Motion is **DENIED** with respect Plaintiff's state and federal law

hostile work environment claims (Counts 1, 2 and 6) and Plaintiff's common law

negligent retention and supervision claims (Counts 4 and 5).

**IT IS SO ORDERED.**


                                                    **s/ Algenon L. Marbley**
                                                    **Algenon L. Marbley**
                                                    **United States District Judge**

**Dated: September 12, 2013**